Filed 7/20/26  Schiffman v. The Standard Fire Ins. Co. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SEVEN

| | |
|---|---|
| MICHAEL SCHIFFMAN, | B335663 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 21STCV11873) |
| v. | |
| THE STANDARD FIRE INSURANCE COMPANY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Rupert A. Byrdsong, Judge.  Affirmed.

Herzog, Yuhas, Fournier & Ardell and Ian Herzog for Plaintiff and Appellant.

Weston & Agness, Aaron C. Agness and Leo L. Ashley III for Defendant and Respondent.

———————————————

Michael Schiffman appeals from the judgment entered after the trial court granted summary judgment in favor of the Standard Fire Insurance Company on Schiffman's lawsuit alleging breach of contract and breach of the implied covenant of good faith and fair dealing arising from Standard Fire's denial of benefits under a personal articles insurance policy. The court based its ruling on Schiffman's refusal to submit to an examination under oath as required by the policy. On appeal, Schiffman contends he was excused from compliance with the requirement he submit to an examination under oath based on Standard Fire's preceding material breach of the policy. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.     *The Insurance Policy*

In 2012 Standard Fire issued Schiffman a personal articles insurance policy, number 932853647 700 7, which was effective from July 2, 2018 to July 2, 2019 (Policy). The Policy insured specified works of fine art that Schiffman owned.

The Policy's "Insuring Agreement" provides, "For payment of premiums when due, we cover the classes of property shown on the Declarations page, subject to all the terms of this policy."[1] The declarations page, in turn, under the heading "Class of Property," reads "Fine Arts – at 1743 Westridge Rd Los Angeles CA." The declarations page further states, "The residence address is located at 1743 Westridge Rd Los Angeles CA . . . ."

---

[1]     Selected capitalization and boldface used in the Policy is omitted.

2

Beneath the insuring agreement, the Policy enumerates 13 "Classes of Personal Property," including in paragraph 7, "Fine Arts, as scheduled, at the location described on the Declarations page," and in paragraph 13, "Miscellaneous Property, not otherwise classified as described elsewhere in this policy." The Policy insures "the described property against risks of direct physical loss subject to the General Exclusions and other provisions of this policy."

As part of its "General Conditions," the Policy addresses "Loss Settlement" and provides in paragraph 2.a: "Fine Arts — For a total loss to a scheduled item, we will pay the amount shown in the schedule for that item. That amount is agreed to be the value of the article." In paragraph 2.c., the Loss Settlement provision provides for "Other Property": "Unless otherwise stated in this policy, the value of the property insured is not agreed upon but will be ascertained at the time of loss. We will not pay more than the least of the following amounts: [¶] (1) The actual cash value of the property at the time of loss. [¶] (2) The amount for which the property could reasonably be expected to be repaired to its condition just before the loss. [¶] (3) The amount for which the article could reasonably be expected to be replaced with one substantially identical."

Paragraph 3 of the General Conditions, titled "Your Duties After Loss," states in subsection (e) that "[i]n case of loss to covered property," the insured must, among other things, "as often as [Standard Fire] reasonably require[s]: [¶]. . . [¶] (3) submit to examination under oath[.]" Paragraph 7 of the General Conditions provides: "Suit Against Us. Legal action may not be brought against us under any coverage provided by this policy unless the insured has fully complied with

3

all the terms of this policy." Paragraph 11 of the section contains a "Concealment and Fraud" provision that voids the entire Policy if, before or after a loss, an insured has "a. intentionally concealed or misrepresented any material fact or circumstance; [¶] b. engaged in fraudulent conduct; or [¶] c. made false statements" relating to the insurance.

Following the last page of the Policy is an endorsement titled, "Special Provisions Valuation" (Endorsement). The Endorsement states, in relevant part, "The valuation of the property insured hereunder is not agreed upon but is left to be ascertained at the time of loss or damage covered hereunder, unless otherwise specifically provided for in this policy. Such loss shall be adjusted on the basis of the actual cash value of the property at the time of loss . . . ." The Endorsement has a place for the insured to date and sign the page. The copy in the record has no date or signature.

B.      *Schiffman's Purchase, Appraisal, and Loss of the Yombe and Dan Pieces*[2]

From November 2014 through early 2015 Schiffman purchased six African art pieces from art dealer Randy Kahn for $455,000, but he but did not take possession of them because Kahn was supposed to find buyers for Schiffman. After the pieces did not sell for over two years, Schiffman demanded Kahn return the pieces to him. In late October or early November 2017, Kahn

---

[2]     Our summary of the purchase, appraisal, and loss of the Yombe and Dan Pieces and the adjustment of Schiffman's insurance claim is based on the undisputed facts taken from the evidence submitted by the parties in connection with Standard Fire's summary judgment motion.

4

gave Schiffman only three of the pieces: a Yombe Mask, a Yombe seated maternity figure, and a Dan figure (Yombe and Dan pieces).

Shortly thereafter Schiffman asked his business manager Eddie Gonzalez to procure insurance for the three Yombe and Dan pieces. On November 6, 2017 Gonzalez emailed an insurance agent with a request to add the three pieces to the Policy, stating he was having the pieces appraised and would forward letters of appraisal to the agent. On November 7 Gonzalez emailed the agent a purported "appraisal" of the Yombe and Dan pieces, attaching a November 6 letter from Kahn to Schiffman titled "Fine Art Valuations." The Kahn letter stated the total value for the three pieces was $317,500. Standard Fire updated the Policy's schedule to include the Yombe and Dan pieces, listing a November 2017 date of appraisal and an "Amount of Insurance" for each piece. The amount of insurance for the three pieces totaled $317,500.

Schiffman also had fellow art collector R.J. Walker seek appraisals of the Yombe and Dan pieces from experts at Bonhams and the Pace Gallery. A letter dated November 3, 2017 from Bonhams valued the pieces collectively at $12,000 to $18,000 (the Bonhams appraisal), and a letter dated November 16 from Walker to Schiffman stated the Bonhams and Pace appraisals valued the pieces at 10 percent of what Schiffman had paid for them (i.e., approximately $30,000).[3] Schiffman sent two emails to

---

[3] Schiffman disputed when he received the Bonhams appraisal. He stated in his declaration submitted in opposition to Standard Fire's summary judgment motion that he learned of the Pace Gallery valuation on November 21, 2017. Schiffman also submitted a declaration from Walker stating he requested an

Kahn on November 21 in which he accused Kahn of misrepresenting the value of the artwork, demanded repayment of $735,000 for "the African tribal art" and other art works, and confirmed Kahn had already repaid him "$15k toward African art." In an email the next day, Kahn disputed the valuation of the claimed "expert" Schiffman had consulted.

In April 2018 Schiffman allowed Kahn to take possession of the Yombe and Dan pieces to show them to clients. Kahn failed to sell any of the pieces over the next year and a half. During this period, Schiffman asked Kahn to return the pieces multiple times, but Kahn did not do so. Kahn eventually stopped communicating with Schiffman in late November 2019.

C.    *The Claim, Investigation, and Lawsuit*

In October 2020 Schiffman submitted a claim under the Policy for theft by conversion of the Yombe and Dan pieces. On October 13 Standard Fire took Schiffman's recorded statement regarding the claim. On October 22 Mike Marinescu, a claims adjuster for Standard Fire, requested Schiffman provide photos of the Yombe and Dan pieces and posed questions for Schiffman to answer regarding his possession of the art pieces and their appraisals. The same day, Schiffman responded with answers to Marinescu's questions, photos of the pieces, bank statements relating to their purchase, and letters relating to their appraisals.

---

appraisal from Bonhams in December 2017 and received the appraisal in a December 19, 2017 email, which he attached to his declaration. Walker declared that he copied the December 19, 2017 Bonhams estimate into an email to Schiffman but "misdat[ed] it November 3, 2017." He attached the misdated email to his declaration.

6

On October 26 Schiffman sent Marinescu a letter describing the timeline for when he possessed the pieces.

On November 5, 2020 Standard Fire sought an appraisal of the Yombe and Dan pieces' actual cash value from Art Conservation Associates, which provided an appraisal dated November 9 of $15,000 for the three pieces. Standard Fire also took a virtual recorded statement from Kahn in early January 2021.

On January 7, 2021 Marinescu sent a letter to Schiffman providing "a summary of [his] payment calculation," which asked Schiffman to "review the estimate" of $15,000 for the "Full Cost of Repair and Replacement" of the Yombe and Dan pieces and to contact Marinescu "[s]hould [he] have questions about any portion of the estimate" before beginning any repairs or replacement. The letter also recited the Endorsement, "which confirm[ed] that the coverage on [Schiffman's] policy [wa]s at Actual Cash Value." The letter further stated, "Our decision is based upon the information and documentation we received in connection with our investigation of this claim. If you are aware of any new or different information or documentation that might lead us to reconsider our decision, please contact us immediately." Standard Fire issued a $15,000 payment to Schiffman between January 7 and 11, 2021.

On January 8, 2021 Schiffman emailed Marinescu to request a "written determination of [his] claim" and to allow Marinescu to "reconsider [his] . . . assessment." Schiffman recounted a telephone conversation he had with Marinescu the day before, during which Marinescu purportedly stated that $15,000 was the amount he "w[as] offering to satisfy the claim." Marinescu responded on January 11 explaining, "We have made

7

a decision to pay and we are doing that based on the contract that you have with us. Your policy though, as I have explained contains an Endorsement . . . , which makes this policy coverage as Actual Cash Value."

On January 12 and 19, 2021 attorney Christopher Marinello, on behalf of Schiffman, emailed Marinescu and requested a signed copy of the Endorsement. Marinescu provided Marinello with the Bonhams appraisal and requested the signed Endorsement from Standard Fire's archive. On February 5 Marinescu wrote Marinello, stating, "we are still looking at coverage but we have retained the services of an attorney that will contact Mr. Schiffman to give Examination Under Oath (EUO)."

On February 23, 2021 attorney Ian Herzog informed Standard Fire that Schiffman had retained him with respect to the claim. On March 1 Standard Fire's attorney wrote to Herzog requesting that Schiffman produce documents and requiring him to sit for an examination under oath on March 22. Herzog responded in a March 10 letter that Standard Fire's letter was "nothing more than an attempt to do discovery in advance of litigation," and further, Standard Fire's breach of contract relieved Schiffman of any obligation to comply with Standard Fire's March 1 demands. In a letter dated March 22, Standard Fire's attorney stated, "your client's claim with Standard Fire remains open," and he again requested that Schiffman submit to an examination under oath. Further, Standard Fire "anticipated that the EUO will allow Standard Fire to complete its claim investigation." Schiffman's attorney responded by letter dated April 9 (enclosing a copy of the summons and complaint) that any

statement from Schiffman should be obtained through his deposition.

Schiffman filed this action for damages and declaratory relief on March 26, 2021, asserting causes of action for breach of contract and breach of the duty of good faith and fair dealing. Schiffman alleged Standard Fire refused to pay the agreed value of his losses as required by the Policy and instead asserted an erroneous coverage position based on the Endorsement to pay only the actual cash value of the Yombe and Dan pieces. Standard Fire breached the Policy by failing to pay the amounts due under the Policy. It also breached the duty of good faith and fair dealing by, among other things, unreasonably refusing to pay for his losses, taking unreasonable positions regarding the interpretation of the Policy, misrepresenting Policy benefits, unreasonably refusing to conduct a thorough investigation of Plaintiff's claims, and failing to engage in a good faith settlement of Schiffman's claim.

On May 13, 2021 Standard Fire sent a letter to Schiffman's attorney denying any further benefits on the claim and reserving its right to seek reimbursement based on a breach of the Policy's concealment and fraud provisions. The letter explained Standard Fire had paid all benefits due under the Policy because the loss did not occur at the Policy's scheduled location and because Schiffman had breached the Policy by refusing to participate in an examination under oath. The letter further noted the Yombe and Dan pieces had been valued in the Policy based on Kahn's letter despite a November 3, 2017 appraisal estimating their value at $15,000, and it explained Standard Fire had requested an examination to inquire about the value and alleged theft of the pieces.

D.    *Standard Fire's Motion for Summary Judgment*

On November 18, 2022 Standard Fire filed its motion for summary judgment or in the alternative summary adjudication. Standard Fire argued Schiffman's breach of contract claim failed because he refused to submit to an examination under oath, which was a condition precedent to receiving benefits under the Policy.[4]  Further, Schiffman rendered the Policy void by violating the Policy's "Concealment and Fraud" provision in that he concealed that (1)  he had received $15,000 from Kahn for the Yombe and Dan pieces, which offset his claim, and (2) he had received the Bonhams appraisal (valuing the pieces at $12,000 to $18,000) prior to procuring coverage for the pieces.  In addition, Standard Fire had paid the maximum recoverable amount under the Policy because the loss did not occur at the scheduled location, which meant the pieces were covered at actual cash value as "Miscellaneous Property" under the policy.  Schiffman's claim for breach of the covenant of good faith and fair dealing also failed because there was no breach of the Policy; Schiffman presented no facts to show Standard Fire acted unreasonably; and Standard Fire's policy interpretation evidenced a genuine dispute as to coverage.

In his opposition, Schiffman argued Standard Fire materially breached the Policy by paying only the actual cash value of the pieces, which excused his performance of the

---

[4]    In a supporting declaration, Marinescu averred Standard Fire had requested an examination under oath to confirm that the Yombe and Dan pieces were not at the Policy's described premises at the time of loss and to investigate the use of Kahn's letter instead of Bonhams' appraisal when adding the pieces to the Policy.

10

condition precedent of submitting to an examination under oath. Further, he did not violate the Policy's "Concealment and Fraud" provision because (1) the $15,000 he received from Kahn was a nonrefundable deposit from a prospective buyer's cancellation, and (2) he received the Bonhams appraisal in December 2017 (after the pieces had been insured). As to Standard Fire's policy interpretation, the Policy contained no clear requirement that the art pieces remain at a location to be covered as scheduled property. With respect to the bad faith claim, a triable issue existed as to whether Standard Fire knowingly relied on the Endorsement and unreasonably interpreted the Policy to require that covered pieces remain at a specified location (among other reasons).

At the October 31, 2023 hearing on Standard Fire's motion, the parties focused on Schiffman's refusal to take an examination under oath. The trial court requested Schiffman's attorney provide authority for the proposition that a material breach occurs when an insured and insurer disagree about how a claim is processed. Schiffman's attorney argued (without citing any case authority) that Standard Fire had made a claims decision to adjust the claim based on the Endorsement, constituting a material breach of the Policy. Standard Fire's attorney countered that the insurer's payment was not a material breach, pointing to Marinescu's February 5 letter as evidence that the claim was still under review. At the conclusion of the hearing, the trial court granted the summary judgment motion.

On December 14, 2023 the trial court entered judgment against Schiffman. Schiffman timely appealed.

11

## DISCUSSION

A.     *Standard of Review*

Summary judgment is appropriate only if there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c); *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618; *Doe v. Roman Catholic Archbishop of Los Angeles* (2021) 70 Cal.App.5th 657, 668.)  "'""We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.'"  [Citation.]  We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.'""  (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347; accord, *Doe*, at p. 669; *Sabetian v. Exxon Mobil Corporation* (2020) 57 Cal.App.5th 1054, 1068.)

A defendant moving for summary judgment has the initial burden of presenting evidence that a cause of action lacks merit because the plaintiff cannot establish an element of the cause of action or there is a complete defense.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853; *Sabetian v. Exxon Mobil Corporation, supra*, 57 Cal.App.5th at p. 1068.)  If the defendant satisfies this initial burden, the burden shifts to the plaintiff to present evidence demonstrating there is a triable issue of material fact.  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850; *Sabetian*, at p. 1069.)

B.       *The Trial Court Did Not Err in Granting Standard Fire's*
         *Summary Judgment Motion*

         1.       *Breach of contract cause of action*

Schiffman contends the trial court erred in granting summary judgment on his breach of contract cause of action because Standard Fire breached the Policy before Schiffman refused to submit to an examination under oath.  Schiffman's contention fails because he did not meet his burden to present evidence of a breach by Standard Fire.

The elements of a cause of action for breach of contract are "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821; accord, *Bennett v. Ohio National Life Assurance Corp.* (2023) 92 Cal.App.5th 723, 729.)  Standard Fire argues Schiffman cannot satisfy the second element because he failed to comply with the requirement under the Policy that he submit to an examination under oath.  Where an insured ""seeks to recover by reason of a contract, . . . he must show that he has complied with such contract on his part.""" (*Brizuela v. CalFarm Ins. Co.* (2004) 116 Cal.App.4th 578, 587 (*Brizuela*); accord, *Hickman v. London Assurance Corp.* (1920) 184 Cal. 524, 534 (*Hickman*); see *Myasnyankin v. Nationwide Mutual Ins. Co.* (2024) 99 Cal.App.5th 283, 288 [""An insured's compliance with a policy requirement to submit to an examination under oath is a prerequisite to the right to receive benefits under the policy.""].)

In *Brizuela*, as here, the trial court granted an insurance company's motion for summary judgment on the plaintiff's causes of action for breach of contract and breach of the covenant of good

13

faith and fair dealing arising from denial of his policy claim, holding the plaintiff had violated the policy requirement that he submit to an examination under oath.  (*Brizuela, supra*, 116 Cal.App.4th at p. 582.)  The Court of Appeal affirmed, explaining, "[C]ompliance with the policy requirement for an examination under oath is a condition precedent to any claim, and the refusal to submit to such an examination causes a forfeiture of any rights under the policy."  (*Id*. at p. 590; accord, *Hickman, supra*, 184 Cal. at p. 534 [reversing judgment in favor of insured because insured violated terms of insurance policy by refusing to submit to examination and to produce its books and papers, holding that "[i]f it appears that the contract has been violated, and thus terminated by the [insured], he cannot recover"].)

Further, an insurer need not "show prejudice before denying policy benefits to an insured who has violated a policy provision requiring submission to an examination under oath." (*Brizuela, supra*, 116 Cal.App.4th at p. 590; see *California Fair Plan Assn. v. Superior Court* (2004) 115 Cal.App.4th 158, 159-160, 167 [granting peremptory writ of mandate that directed trial court to vacate order denying insurer's summary judgment motion where insured failed to submit to examination under oath, despite insurer's failure to show prejudice].)  Moreover, if an insurance policy requires the insured to submit to an examination under oath, "it is not for the insured to inquire into the motive actuating the company in exacting the examination," as long as the examination is on proper subjects of inquiry. (*Hickman, supra*, 184 Cal. at p. 530; accord, *Globe Indemnity Co. v. Superior Court* (1992) 6 Cal.App.4th 725, 731; see Ins. Code, § 2071.1, subd. (a)(2) ["An insurer may conduct an examination

14

under oath only to obtain information that is relevant and reasonably necessary to process or investigate the claim."].)

As discussed, paragraph 3 of the Policy's General Conditions required Schiffman to submit to an examination under oath "as often as [Standard Fire] reasonably require[s]," and paragraph 7 barred Schiffman from filing suit against Standard Fire under the Policy unless he "fully complied with all the terms of this policy."[5]  Accordingly, Standard Fire met its initial burden on summary judgment by presenting evidence Schiffman forfeited his right to recover under the Policy (and file this action) by failing to comply with the Policy's requirement that he submit to an examination under oath.

Schiffman contends he met his burden on summary judgment because he presented evidence demonstrating a triable issue of material fact that Standard Fire breached the Policy, thereby excusing Schiffman from complying with the requirement he submit to an examination under oath.  Specifically, Schiffman argues that Standard Fire, in its January 7, 2021 letter, as clarified by Marinescu's January 11 email, made a final "underpayment of the claim" (by paying $15,000) based on the

_____

[5]  Schiffman does not contend Standard Fire's request for an examination under oath was not reasonable.  Further, in his supporting declaration, Marinescu averred Standard Fire had requested an examination under oath, among other things, to investigate Schiffman's reliance on the $317,500 valuation of the art pieces in obtaining coverage without disclosing the Bonhams appraisal valuing the art pieces between $12,000 and $30,000. (See *Myasnyankin v. Nationwide Mutual Ins. Co., supra*, 99 Cal.App.5th at p. 288 ["'[e]xaminations under oath are frequently conducted under circumstances where the loss is undocumented or suspect.'"].)

15

Endorsement, which was an "erroneous reading of its own policy." Schiffman points to language in the January 7 letter that advised Schiffman that he could have his claim reviewed by the California Department of Insurance and that provided notice of the limitations period for filing suit. Schiffman argues, "Under California law, notification of the suit limitation period means that the insurer has concluded the claim either by denial or issuance of payment." Schiffman does not, however, cite any authority for his blanket statement that once an insurer advises the insured of the limitations period for filing suit, that means the insurer has made a final decision on the claim.

Instead, Schiffman relies on case authority addressing the tolling of the statute of limitations for an insured to file an action against an insurer for breach of an insurance policy.[6] Although these cases are in a different context, we agree with Schiffman that they are helpful to our analysis because they address the circumstances under which an insurer's denial of a claim is sufficiently unconditional and unequivocal for an insured's cause

---

[6] *Marselis v. Allstate Ins. Co.* (2004) 121 Cal.App.4th 122, relied on by Schiffman, does not support his contention. In *Marselis*, the Court of Appeal recited the rule that "the one-year limitations period, which begins running at the 'inception of the loss' [citation], is equitably tolled 'from the time an insured gives notice of the damage to his insurer . . . until coverage is denied.'" (*Id.* at p. 125.) The court concluded that equitable tolling did not apply to allow the insured to reopen her claim because the insured received "full payment on her claim" and had represented to a government agency that her claim was no longer pending and she expected no further recovery. (*Id.* at pp. 125-126.) The court did not address under what circumstances an insurer has breached an insurance policy by finally denying a claim.

16

of action for breach of an insurance policy to accrue. However, they do not support Schiffman's position: To the contrary, the statute of limitations on an insured's cause of action for breach of an insurance policy is tolled only by the *unconditional* denial of an insured's claim in writing. (*Doheny Park Terrace Homeowners Assn., Inc. v. Truck Ins. Exchange* (2005) 132 Cal.App.4th 1076, 1088 ["The tolling period ends . . . upon the insurer's *unconditional denial* of the insured's claim *in writing*."]; *Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1143 [cause of action for breach of an insurance contract accrues for purposes of statute of limitations when the insured becomes "aware of the factual predicate to [his or her] suit and . . . aware [his or her] claim ha[s] been unconditionally denied"]; see *Vu v. Prudential Property & Casualty Ins. Co.* (2001) 26 Cal.4th 1142, 1149 [it is "well settled that 'an unconditional denial of liability by the insurer after the insured has incurred loss and made claim under the policy gives rise to an immediate right of action'"].) Other courts have required for equitable tolling that an insurer's denial be an "'unequivocal' denial in writing." (*Migliore v. Mid-Century Ins. Co.* (2002) 97 Cal.App.4th 592, 604; accord, *Aliberti v. Allstate Ins. Co.* (1999) 74 Cal.App.4th 138, 149.)

We agree with Standard Fire that it did not unconditionally (and unequivocally) deny Schiffman's claim (for amounts above $15,000) in January 2021 such that Schiffman was excused from submitting to an examination under oath. As discussed, Marinescu's January 7 letter stated it was providing a "summary of [the] payment calculation" under the Policy, and it requested Schiffman "review the estimate provided." Further, Standard Fire encouraged Schiffman to contact Marinescu if he had "questions about any portion of the estimate." Moreover, the

17

letter explained the coverage under the Endorsement (limited to actual cash value) but made clear its "decision" was based on the information it had received as part of its investigation, adding, "If you are aware of any new or different information or documentation that might lead us to reconsider our decision, please contact us immediately."

It is undisputed that Schiffman contacted Marinescu by email the next day expressing disappointment with Standard Fire's position and referring to Marinescu's statement that $15,000 was "the amount [he was] offering to satisfy the claim." Further, Schiffman described the $15,000 claim amount as Standard Fire's "initial assessment" and requested a "written determination of [his] claim." Less than a week later Marinello became involved as Schiffman's attorney, and the discussions over Schiffman's claim continued. Marinescu reiterated Standard Fire's interpretation of the Policy, worked to comply with Marinello's requests for documents (to obtain a signed copy of the Endorsement) and, as early as February 5 (less than a month after the January 7 letter), stated "we are still looking at coverage." In that same email, Marinescu stated Standard Fire's attorney would be contacting Schiffman about an examination under oath.

Taken together, these undisputed communications do not create a triable issue of fact that Standard Fire had unconditionally denied Schiffman's claim such that it materially breached its obligations under the Policy. The fact Standard Fire sent a $15,000 payment to Schiffman (that Schiffman did not cash) does not convert the January 7 letter into an unconditional denial of further benefits under the policy, especially given the continuing discussions over coverage under the policy. (See

18

*Aliberti v. Allstate Ins. Co., supra*, 74 Cal.App.4th at pp. 140-142, 149 & fn. 15 [limitations period for breach of insurance policy was tolled because insurer "never formally and unequivocally denied" plaintiff's claim despite initially issuing a check to the insured that bore the notation "paid in full"].)

 *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, relied on by Schiffman, is distinguishable. In *Gruenberg*, the Supreme Court held a plaintiff adequately alleged a cause of action for breach of the covenant of good faith and fair dealing by alleging the defendant insurers, knowing plaintiff would not appear for an examination under oath during the pendency of criminal charges, willfully and maliciously conspired to deprive him of fire policy benefits by falsely implying to investigative authorities that plaintiff had a motive to commit arson, then using his failure to appear at an examination under oath as a pretense to deny coverage. (*Id.* at p. 575.) *Gruenberg* addressed only the viability of the plaintiff's bad faith cause of action. Further, *Gruenberg* does not assist Schiffman because Schiffman's refusal to submit to an examination under oath was based on Standard Fire's alleged breach of the Policy by denying him further benefits—a reason we have concluded did not excuse him from his failure to appear. The court in *Gruenberg* observed that because the plaintiff alleged his failure to appear at the examination was induced by the insurers' "conduct, in breach of their duty of good faith and fair dealing," the "plaintiff's obligation to appear may be seen as excused by defendants' alleged breach." (*Id.* at p. 578, fn. 9; see *Brizuela, supra*, 116 Cal.App.4th at p. 593 [distinguishing *Gruenberg* from a plaintiff's failure to appear at an examination under oath because *Gruenberg* "did not involve

an insured's *unexcused* failure to attend an examination under oath"].)[7]

###### 2. *Breach of the implied covenant of good faith and fair dealing*

The implied covenant of good faith and fair dealing is "based on the contractual relationship between the insured and the insurer." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36; accord, *All Green Electric, Inc. v. Security National Ins. Co.* (2018) 22 Cal.App.5th 407, 418.) "[T]he covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement." (*Waller,* at p. 36.) In the context of a claim related to the denial of insurance benefits, "'[T]here are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause.'" (*Mosley v. Pacific Specialty Ins. Co.* (2020) 49 Cal.App.5th 417, 435; accord, *Love v. Fire Ins. Exchange, supra*, 221 Cal.App.3d at p. 1151.)

As discussed, Standard Farm's withholding of further benefits under the Policy was based on Schiffman's refusal to comply with the Policy's requirement to submit to an

---

[7] Because we conclude Schiffman did not present evidence that Standard Fire breached the Policy, we do not reach Standard Fire's alternative arguments, including that it was not required to pay under the Policy because the Policy only covered loss of the art pieces at the location described in the declarations page (i.e., at Schiffman's home).

examination under oath without a reasonable excuse. Accordingly, Schiffman's bad faith claim fails as a matter of law. (See *Brizuela*, *supra*, 116 Cal.App.4th at pp. 594-595 [summary judgment on bad faith cause of action properly granted where plaintiff "never agreed to submit to an examination under oath following his initial unexcused failure to appear"].)

## DISPOSITION

The judgment is affirmed.  Standard Fire is to recover its costs on appeal.


FEUER, J.

We concur:


SEGAL, Acting P. J.


STONE, J.